Filed 3/13/24  L.B. v. Superior Court CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| L.B., <br><br> Petitioner, <br><br> v. <br><br> SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent; <br><br><br> SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | A169341 <br><br> (San Francisco County <br> Super. Ct. No. JD223111) |

Petitioner L.B. (mother) seeks review by extraordinary writ of the juvenile court's orders terminating her reunification services with her child, A.B. (child), and setting a permanency planning hearing.  (Welf. & Inst. Code, § 366.26.)[1]  She contends the juvenile court erred in terminating her reunification services at the combined 6-, 12-, and 18-month review (§ 366.21,

_____

[1] All undesignated statutory references are to the Welfare and Institutions code.  All further references to the hearing under section 366.26 are to the .26 hearing.

1

subds. (e), (f) because the San Francisco Human Services Agency (Agency) did not timely provide her with reunification services tailored to accommodate her disabilities. Because the record amply demonstrates mother was provided with reasonable services, we deny the petition.

## BACKGROUND

### *The Juvenile Court Finds A.B. at Risk of Neglect*

Mother is a client of the Golden Gate Regional Center (GGRC) "due to her cognitive and speech impairment as well as her intellectual disability." Shortly after giving birth to the child in March 2022, mother agreed to follow a safety plan requiring her and the child to stay with a relative and receive support from GGRC aides and a public health nurse. The safety plan failed due to mother "not getting along with" the aides and threatening her relative. The Agency filed a dependency petition and obtained a warrant to remove the child from mother's care in April.

The operative petition alleged the child had suffered or was at substantial risk of suffering serious physical harm or illness due to mother's inability to provide regular care for him due to her mental illness and developmental disability.[2] (§ 300, subd. (b).) The Agency specifically alleged that mother's cognitive impairments, developmental delays, and anger management issues prevented her from meeting the child's daily needs without constant support. The juvenile court detained the child and placed him in foster care.

The Agency's jurisdiction and disposition report filed in June 2022 noted that mother suffered from a moderate intellectual disability and

---

[2] The child's biological father (father) declined to participate in the dependency case and is not a party on appeal. Accordingly, this opinion does not discuss allegations pertaining to him.

mental health challenges. She lived independently in a one-bedroom apartment associated with Compass supportive housing.[3] Mother had a GGRC case manager and a payee who handled her finances; she had recently qualified for In-Home Supportive Services (IHHS)[4] assistance with household tasks. GGRC had attempted to link mother with Let's Thrive Supportive Living Services program, but mother "was not happy with the workers" from that program.

Mother had been participating in prenatal sessions with the Homeless Prenatal Program for the preceding five months. The public health nurse who visited mother weekly told the social worker that mother did not "know/remember many basic parenting skills." It was unclear if mother would be able to care for the child without full-time, live-in support. The Agency described mother as "temperamental," noting that she had "fired both professional and relative caregivers," "leaving no one available to assist her." Mother had been referred to therapy for anger management but refused to engage. Mother was having consistent, beneficial, supervised visits with the child.

In late June 2022, mother submitted to jurisdiction based on the Agency's report and recommendation. The juvenile court sustained the petition and granted the Agency's request to bifurcate disposition in order to obtain a psychological evaluation assessing mother's ability to parent. In

---

[3] According to the Agency, "Compass supportive housing provides on-site case management as it relates to independent living, and identifying community resources for substance abuse, mental health, employment skills, and parenting."

[4] IHHS provides home-based services such as meal preparation and clean up, non-medical self-care, accompanying people to appointments or errands, and cleaning services.

August, the court granted the Agency's request for a second psychological evaluation of mother and continued the disposition hearing to October.

### *Following a Contested Disposition Hearing, the Juvenile Court Orders Reunification Services for Mother*

In October 2022, the Agency recommended that neither parent be offered reunification services. As relevant here, it maintained that mother met the statutory criteria for bypass due to a mental disability (§ 361.5, subd. (b)(2)).[5]

The Agency described the child as "an easy-going baby with a beautiful smile" who had been referred to GGRC to assess possible developmental delays. The child appeared to enjoy supervised visits with mother.

The Agency described its unsuccessful initial efforts to enroll mother in parent education services. The referral to the Infant Parent Program (IPP)

---

[5] "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (2) That a parent or guardian is suffering from a mental disability . . . that renders the parent or guardian incapable of utilizing those services." (§ 361.5, subd. (b)(2).)

Section 361.5. subdivision (b)(2) incorporates definitions of parental unfitness described in Family Code section 7820 et seq. "Disability" is broadly defined in the Family Code as "any physical or mental incapacity which renders the parent or parents unable to care for and control the child adequately." (Fam. Code, § 7824, subd. (a).) " 'Mentally disabled' . . . means that a parent or parents suffer from a mental incapacity or disorder that renders the parent or parents unable to care for and control the child adequately." (Fam. Code, § 7827, subd. (a).) Additionally, a parent may be deemed unfit if "declared by a court of competent jurisdiction, wherever situated, to be developmentally disabled or mentally ill." (Fam. Code, § 7826, subd. (a).)

4

for dyadic therapy[6] or therapeutic visitation was denied because mother did not meet program criteria. The referral to the SafeCare[7] parent education program "was declined due to the mother's cognitive delay not allowing her to benefit from services." Mother was placed on a wait list for parenting classes at Family Works, a GGRC vendor which offered "essential parenting and life skills for people with cognitive disabilities." The social worker noted that "[u]nfortunately, there is not a program that would provide [mother] with 24/7 assistance and oversight to care for [the child] until he is an adult."

The Agency recommended that mother engage in individual therapy to address concerns that she had been exploited by father and others. Mother admitted she "gives [father] money, debit card, and sex when he asks" and that she purchased drugs for him. Several professionals working with mother—including two social workers, mother's physician, and two community service providers—"ha[d] spoken with [her] about personal and financial safety and discussed how [father] takes advantage of her," yet mother "had not taken any steps to protect herself from his abuse." The Agency was concerned that if mother could not protect herself, she may not be able to protect her child from abuse or exploitation.

Mother's diagnosis of "intellectual disability, moderate impairment" was confirmed by the psychological evaluations prepared by licensed psychologists Dr. Loomis and Dr. Cornejo. Each psychologist described mother as attentive and loving with the child and willing to learn to care for

---

[6] Dyadic therapy "incorporates how the parent's trauma may affect their parenting of the child and [helps a parent] recogniz[e] their child's emotional needs and development."

[7] In its response to the petition, the Agency describes SafeCare as "an in-home parent training program that targets risk factors for child neglect and physical abuse in which parents are taught skills in three module areas."

him.  However, both experts expressed concern about mother's ability to make progress within the short time frames allowed in dependency cases. Dr. Loomis opined that "[mother] is not likely to reach independent parenting capacity within a reasonable timeframe."  She stated that although mother "is responsive and welcoming of coaching in the moment, those supports are not translating into independence."  In the event that the juvenile court decided to offer reunification services to mother, Dr. Loomis identified numerous specific services and accommodations to assist her.[8]

Dr. Cornejo recommended many of the same services and accommodations suggested by Dr. Loomis.  She emphasized that mother should engage in parenting classes and work with a public health nurse for at least two years.  Dr. Cornejo noted that mother's reported history of acting out when frustrated might be a barrier to reunification; Dr. Cornejo cautioned that mother's cognitive and executive functioning skills were unlikely to significantly improve.

At the conclusion of the contested disposition hearing, which took place over several days between October and December 2022, the juvenile court found that the Agency had not established grounds to bypass mother by clear

---

[8] Dr. Loomis recommended (1) individual therapy with a clinician who is willing to adapt communication and intervention methods to meet mother's needs; (2) diagnosis and treatment of identified health issues which impact mother's daily functioning; (3) simple, concrete coaching on signs of manipulative/exploitive behaviors and how to respond; (4) literacy training and/or appointment of a trustworthy and knowledgeable support person to review written materials with mother and answer questions; (5) use of appropriate language, slower conversation and comprehension strategies when communicating with mother; and (6) parenting support, including dyadic parent-child therapy and/or interactive parenting classes or playgroups which involve "a regular and significant live coaching component."

and convincing evidence. It declared the child a dependent and ordered the Agency to provide reunification services to mother.[9] In December, the parties returned to court to adopt a service plan for mother. The court set an interim review for February 2023, and a six-month review (§ 366.21, subd. (e)) for May.

### *Mother's Progress in Reunification Services*

### (1) Mother's Form JV-180 Request to Modify Her Case Plan

In February 2023, mother submitted Judicial Council Forms, form JV-180 Request to Change Court Order pursuant to section 388 asking the juvenile court to revise her case plan "to allow her to utilize other services that are more appropriately tailored to her disability and that support her in parenting [the child] adequately." The court set a hearing on mother's section 388 petition. In early March, however, the parties stipulated to the adoption of a modified case plan developed with input from mother's attorney and her disability advocate. The court adopted the modified case plan and denied mother's section 388 petition without prejudice.

### (2) The Agency Files its Six-month Status Review Report

In May 2023, the Agency filed its status review report recommending termination of mother's reunification services. Understanding that the reasonableness of mother's services would be the focus of the hearing, the Agency discussed the referrals it made and mother's progress in some detail.

---

[9] Mother appealed from the court's jurisdictional and dispositional orders. The appeal was dismissed after appellate counsel filed a "no issues" statement and mother did not file supplemental briefing.

(a) Individual Therapy

In July 2022, the social worker referred mother to the Hyde Street Clinic for individual therapy. Mother did not contact the Clinic for an intake appointment and was therefore not enrolled.

In December 2022, following the disposition hearing, the Agency referred mother to Compass Family Services for individual therapy. The social worker advised mother's therapist of the accommodations recommended by Drs. Loomis and Cornejo, and the therapist employed these strategies when therapy sessions with mother began in late January 2023. The therapist reported that mother became agitated "when faced with difficult questions about her relationship with the child's father, and identifying ways to keep herself safe." Although she was able to "recite some steps for safety, . . . [she] is not able to apply them." For example, mother had a physical altercation with a man she was sexually involved with which resulted in mother's arrest. The therapist reported that mother's lack of engagement and avoidance limited her progress in therapy.

In April 2023, mother's GGRC case manager referred mother for therapy at Creating Behavioral and Educational Momentum (CBEM)[10] to work on anger management and develop tools to recognize and avoid intimate partner violence and exploitation.

(b) Parenting Education

The public health nurse continued to provide mother with weekly parent coaching as she had since the inception of the case. The nurse reported that mother had difficulty retaining and applying information from

---

[10] "CBEM provides holistic support and services to adults and children with developmental disabilities with co-occurring physical or mental health disorders."

one session to the next. After mother began working with CBEM in April 2023, the nurse focused her weekly sessions on managing finances, setting life goals, and setting appropriate boundaries with father. Mother told the public health nurse to stop calling or coming around in May. The public health nurse left the case open in the event mother wished to resume services.

In late January 2023, mother began meeting weekly with a clinician at the Instituto Familiar de la Raza who offered dyadic therapy. Parent-child sessions commenced in late February. The clinician worked with mother "to manage frustration while responding to the child's needs." Mother unilaterally discontinued services with the clinician from late-March until mid-April due to mother's misconception that the clinician was romantically interested in father. Mother re-engaged in dyadic therapy after the social worker intervened.

In December 2022, GGRC assigned a clinician who had "specialty training working with parents with disabilities while parenting children with special needs" to provide weekly Early Intervention Services to the child. After working with mother and the child, the clinician echoed concerns of others, including the public health nurse, that mother "does not retain the information from one session to the next about meeting the child's needs." She opined that "mother's poor impulse control leads to vulnerability to the child being harmed."

Mother stopped working with the Early Intervention clinician in March 2023 because she felt disrespected when the clinician suggested that mother feed the child healthy snacks. The social worker unsuccessfully tried to get mother to re-engage with the Early Intervention clinician in April; mother terminated services in May.

9

(c)  Independent Living Skills

The Agency reported that mother's GGRC case manager contacted 25 potential providers in an effort to hire an IHHS worker to assist mother with household tasks.  "Mother had burned bridges with [IHHS] providers through displaying aggressive and hostile behaviors and firing providers."  In March 2023, mother was referred to Arcadia Home Care and Staffing for assistance with housekeeping, transportation, meal preparation and grooming, and to Emerald Care, a GGRC program which assists disabled adults with cooking, budgeting, and self-care skills.  The social worker noted that "[d]espite working with multiple agencies," mother's "history of aggressive behaviors and firing providers . . . makes the recruitment of new providers difficult, despite significant intervention.  She also has difficulty understanding what services she has been approved for and continues to insist that she can have a live-in provider, although it has repeatedly been explained to her that she is not eligible for this level of support."

The social worker also referred mother for cooking classes and social groups at the Western Addition Family Resource Center, but mother declined to participate in these services.

(d)  Visitation

Mother consistently engaged in supervised visits with the child. However, in March 2023, mother's aggressive behavior caused a visit supervisor to decline services to mother, which "created a major disruption to the consistency and frequency of the visitation for over a month as the [Agency] had to find another visitation site, supervisor and transportation." The same thing happened in September.

(e) Court Sets Contested Six-month Review Hearing

The Agency recommended "termination of services because the mother's intellectual disability and mental health needs create barriers to providing a safe environment for the child and meeting the child's social, emotional and developmental needs." It stated that "even with services, she has been unable to demonstrate that she is able to obtain, retain and transfer information to meet the child's needs." After being served with the Agency's report, mother blocked the social worker and refused to communicate with her.

The juvenile court continued the matter to July 2023, and then to September, for a contested hearing.

**(3) The Agency Obtains a Juvenile Restraining Order**

In August 2023, the city attorney gave notice of the Agency's intent to seek a juvenile restraining order against mother on behalf of the social worker based on voice messages mother had left threatening physical violence.[11] That same month, the court granted a juvenile restraining order against mother for a 16-month period ending December 31, 2024.

**(4) Mother Files a Declaration Opposing the Agency's Recommendation to Terminate Reunification Services**

In September 2023, mother filed a declaration opposing termination of reunification services. Mother declared she had been working diligently to reunify with the child, and she complained that the Agency "did not give me a good worker," and "didn't really support me or help with my case." Mother

_____

[11] On August 9, 2023, following a meeting with her attorney and the social worker, mother had left the social worker a voice message telling the social worker to stay away from the child or mother would knock out her teeth, pull her hair or "have somebody shoot [her] ass," even if mother had to go back to jail.

11

disclosed that she was pregnant by Samuel L., the alleged victim in the domestic violence incident which occurred in May. Mother insisted that she was no longer in contact with father or Samuel.

### (5) The Agency Files a First Addendum to the Six- and 12-month Status Review Report

The Agency continued to recommend termination of mother's reunification services in a September 2023 addendum report. Despite mother's service providers being respectful, empathetic, and employing the recommended accommodations when delivering services, the social worker reported that "mother is easily triggered and will make false allegations and statements about the conduct of the providers to justify terminating services." As a result, "mother has experienced a cycle of disrupting services, which has impacted her ability to gain the knowledge for tools needed to build skills for independent living, management of mental health concerns and parenting education."

As of September 2023, mother had made little to no progress in acquiring independent living skills. IHHS had closed mother's case in August. CareBeyond continued working with mother on life skills such as grocery shopping, budgeting, cooking, and home maintenance despite mother being "mean, rude, and disrespectful," and occasionally demanding that the provider simply perform the task rather than model it for her.

Mother's participation in individual therapy at Compass declined after May 2023 and was terminated in August. Taylor Davis at CBEM continued to work with mother on skills to protect herself from intimate partner violence and exploitation, and anger management. Mother nevertheless continued to engage in a sexual relationship with father, allowed father to smoke controlled substances around her, and stored the device he used to smoke controlled substances at her apartment.

12

The Agency presented additional details about the alleged incident of domestic violence between mother and Samuel—the alleged father of mother's unborn child—which occurred in May 2023. Samuel told police that mother had punched him, resulting in her arrest. While she was in jail, law enforcement realized that mother had an outstanding warrant for an earlier alleged incident of domestic violence.

On October 16, 2023, mother filed a trial brief which argued that she was entitled to an extension of services because the Agency failed to comply with the Americans with Disabilities Act (ADA; 42 U.S.C. § 12101 et seq.) and did not provide her with reasonable services.

**(6) The Agency Files a Second Addendum to the 6-, 12-, and 18-month Status Review Report**

On November 27, 2023, the Agency filed a second addendum report in advance of what was now the combined 6-, 12-, and 18-month review.

CareBeyond continued to provide in-home life skills training to mother. The expectation was that mother would practice the skills modeled by the provider, but instead, she "mostly sits and sleeps while [the provider] is present." She also cancelled frequently. Mother did not maintain her apartment in a sanitary condition between the provider's visits, which presented a safety risk to a small child.

Even more concerning was the report from mother's housing case manager about an incident of intimate partner violence which occurred in October 2023 while the review hearing was underway. At mother's request, the housing authority had reversed its decision banning Samuel from the apartment complex where mother lived. On October 18, mother invited Samuel to her apartment, where he got drunk on alcohol she had purchased and punched her in the face. Mother did not report this incident to the social

13

worker. Mother's CBEM therapist testified that it would be unsafe for the child to be around father or Samuel due to their history of abusing mother.

The social worker testified that she had utilized the accommodations recommended by Drs. Loomis and Cornejo in case-planning and discussions with mother, and that she worked in tandem with mother's disability advocate to resolve impasses with mother's service providers. When asked if there were any other supportive services which could have been provided to mother, the social worker responded: "I feel we have run our course of service delivery to the mother."

In December 2023, mother filed a second legal brief further outlining her argument that she was entitled to an extension of reunification services because the Agency had failed to offer her reasonable services. The court heard argument and continued the matter for a ruling.

### *The Juvenile Court Finds that the Agency Provided Reasonable Services to Mother*

The court began its decision by rejecting mother's argument that the ADA could be asserted as a defense in a dependency case. It went on to find that "the mother's 18-month review date was October 27, 2023," and "there is not a substantial probability that the child would be returned within 24 months to the mother's care and custody." The court specifically found that the Agency offered mother reasonable services designed to "accommodate this particular mother's disability and this particular mother's special needs. When something did not work in the beginning in early January 2023, the agency pivoted. They came up with a new plan, different people, different services to meet, accommodate, and tailor the services to this particular mother." The court described the Agency's reports as "methodical" and "quite explicit and quite detailed," and the social worker's testimony as "credible" and "believable."

14

The court terminated mother's reunification services and set a .26 hearing for April 2024.

Mother filed the instant petition for extraordinary writ in January 2024. We issued an order to show cause and a temporary stay of the .26 hearing set for April.

**DISCUSSION**

Mother's sole argument is that the Agency failed to provide her with timely reunification services which adequately addressed her disabilities. Before we explain why this argument fails, we provide a brief overview of the law governing the Agency's duty to provide reunification services.

## I. Applicable Law

When a child has been removed from a parent and declared a dependent, the juvenile court must order family reunification services "designed to facilitate the reunification of the family," which may "include evaluations and assessment, counseling, parent education, substance abuse treatment and testing and other forms of assistance." (§ 361.5, subd. (a); *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).)

"To balance the interest in family preservation with the child's interest in the prompt resolution of her custody status and long-term placement, the dependency law establishes a detailed timeline for reunification." (*Michael G.*, *supra*, 14 Cal.5th at p. 625.) A parent of a child who was under age three at the time of removal is presumptively eligible for at least six months of reunification services. (§ 361.5, subd. (a)(1)(B).) Reunification services are ordinarily provided for a maximum of 18 months after a child has been removed from parental custody. (§ 361.5, subd. (a); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.)

15

"During the reunification stage, the juvenile court must hold periodic review hearings to evaluate the status of reunification efforts and appropriate next steps.  (§ 366.21.)  These review hearings ordinarily take place at six-month intervals.  At each review hearing, a court evaluates, among other things, the adequacy of the reunification services offered or provided and the extent of the parent's progress.  If, at the six- or 12-month status review hearing, the court finds that there is a substantial probability the child may be returned to her parent within six months, or that reasonable services were not provided to the parent, the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning." (*Michael G.*, *supra*, 14 Cal.5th at p. 625.)  "The court may schedule the section 366.26 permanency hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.' " (*Ibid.*)

The agency must make a good faith effort to provide reasonable services " ' " 'specifically tailored to fit the circumstances of each family' " ' " and " ' " 'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " ' " (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420.)  "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  "The effort must be made to provide reasonable reunification services in spite

16

of difficulties in doing so or the prospects of success." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010–1011, superseded by statute on other grounds as stated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504.) "The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case." (*Id.* at p. 1011.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

"A developmentally disabled natural parent is entitled to services which are responsive to the family's special needs in light of the parent's particular disabilities." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790; *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320.) "[W]hen a parent has a mental illness or disability, that condition must be the 'starting point' for a family reunification plan, 'not its conclusion.' " (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1241 (*T.J.*), disapproved on other grounds in *Michael G., supra,* 14 Cal.5th 609.) "[B]efore the parental rights of a developmentally disabled parent can be properly terminated the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored." (*In re Victoria M.* at p. 1320.)

Effective January 1, 2024, the Legislature amended section 366.22, subdivision (b)(2) to provide that the remedy for a failure to provide reasonable services at an 18-month review hearing is to require the juvenile court to provide six additional months of services unless it finds, by clear and convincing evidence, that continuing the matter would be detrimental to the child. (§ 366.22, subd. (b)(2)(A).)

17

## II. The Agency Provided or Offered Mother Reasonable Services

### A. Standard of Review

When considering a petition challenging the juvenile court's orders terminating a parent's reunification services and setting a .26 hearing, " '[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard.*' " (*T.J.*, *supra*, 21 Cal.App.5th at p. 1239.)

"Ordinarily, our review would be limited to that period following the last reasonable services finding, which if unchallenged is final and binding." (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 675.) However, where, as in this case, the juvenile court combined the review hearings and determined the reasonableness of reunification services for the first time at the 18-month review, we review the entire reunification period to determine whether reasonable services were provided. (*Ibid.*)

### B. The ADA Does Not Apply to Dependency Proceedings

Congress enacted the ADA to eliminate discrimination faced by disabled individuals, such as being excluded from or prevented from fully using and enjoying goods, services, facilities, privileges, advantages, or public accommodations. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1138–1139, disapproved on other grounds as stated in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The ADA generally applies to state and local public entities; because California's juvenile dependency law requires the courts and social services agencies to consider a parent's limitations and disabilities in providing reasonable services, "the ADA does not directly apply to juvenile dependency proceedings and cannot be used as a defense in them."

(*In re Diamond H.*, at p. 1139; *In re Anthony P.* (2000) 84 Cal.App.4th 1112, 1113, 1116.)

Mother acknowledges the holdings in *In re Diamond. H.* and *In re Anthony P.* but asserts that "much has changed" in the 20 years since these cases were decided. She cites recent cases in Michigan and Colorado which hold that a child welfare agency must modify its services or offer accommodations to disabled parents, and a case in New York which states that courts may look to accommodations ordered in ADA cases to "provide guidance" about feasible and appropriate accommodations for disabled parents. Mother does not directly advocate for a change in California law regarding the application of the ADA in dependency cases. Nor does she explain how she was prejudiced, if at all, by the juvenile court's decision that the ADA did not directly apply to her case. Accordingly, we proceed to evaluate the reasonableness of the services offered to mother under California law without reference to the ADA.

### C. Mother's Services Were Timely and Tailored to Meet Her Needs

Mother's amended case plan contains three service objectives: she was required to (1) meet her child's needs and provide a safe home; (2) consistently and appropriately parent her child; and (3) take appropriate action to avoid being a victim of further domestic violence and exploitation. To assist mother in meeting these objectives, the Agency was required to provide or offer the following services: (1) "hands-on, in-person parenting classes or dyadic therapy with providers who will be able to work with her level of understanding"; (2) services to gain independent living skills such as maintaining a clean and safe household, having enough food in the home, managing finances, keeping herself and her child safe from abusive relationships, and establishing a healthy support network; and (3)

19

"individual therapy tailored to her intellectual and developmental disabilities to . . . learn[] to avoid abusive relationships and protect herself emotionally, physically and financially."

Mother contends that the services provided in this case failed in three ways: first, some of the services were not reasonably tailored to meet her needs; second, she experienced excessive delays in actually connecting with service providers; and third, the Agency failed to offer some necessary services altogether. We reject each contention for the reasons that follow.

## (1) Mother Was Offered Timely Individual Therapy Designed to Meet Her Specific Needs

Mother was re-referred for individual therapy after the disposition hearing concluded in December 2022; sessions began approximately two months later. Mother argues that the Agency's referral to Compass for individual therapy was inadequate because the therapist was a trainee who had not yet achieved licensure and her prior experience working with cognitively impaired clients was unknown. Mother does not dispute the uncontroverted evidence that, as required by her case plan, the therapist utilized the accommodations recommended in mother's psychological evaluations in her therapy sessions. She offers no reasoned explanation how a better outcome might have been achieved had the therapist been licensed, and her suggestion that the therapist may have lacked prior experience with cognitively impaired clients is speculative. We therefore consider these points waived. (*A.F. v. Jeffrey F.* (2023) 90 Cal.App.5th 671, 689 [arguments which are not sufficiently developed may be summarily rejected].)

Even if mother had not waived these points, the reasonableness of the Agency's referral to Compass for individual therapy "may depend to some degree upon the parent's willingness to cooperate in the completion of his or her reunification plan." (*In re K.C.* (2012) 212 Cal.App.4th 323, 330.) Here,

20

the evidence established that mother's unwillingness to engage with the therapist and broach difficult issues impeded her progress in therapy. Moreover, mother's attendance declined after May 2023, despite the social worker and therapist's efforts to keep her engaged, and eventually ceased in August.

In the meantime, mother continued to receive individual therapy with Davis, a clinician with substantial experience working with clients with developmental disabilities. Davis worked with mother on issues of anger management, intimate partner violence, and exploitation—the same issues mother had been working on with her other therapist. In *T.J.*, *supra*, 21 Cal.App.5th at pages 1243–1244, the court faulted the agency for failing to engage the mother in individual therapy or anger management services during the initial six months following the disposition hearing. Here, mother saw two qualified therapists within this time span, and she cumulatively received 11 months of individual therapy on the issues identified in her case plan.

Mother also argues the Agency "overlooked the progress mother was making" in therapy with Davis. It is not the Agency who "overlooked" the facts, but mother herself. The record demonstrates that despite months of therapy specifically tailored to address her intellectual disability, mother proved unable to utilize the skills she had been taught to protect herself from exploitation and intimate partner violence. Mother's involvement in a domestic violence incident with the abusive father of her unborn child in October 2023, while the review hearing was underway, underscores this point. In short, the evidence supports the juvenile court's conclusion that mother was offered reasonable individual therapy services but failed to benefit from them within the statutory time frame.

21

### (2) Mother Was Provided "Hands-on" Parent Education Throughout the Case

In *T.J.*, *supra*, 21 Cal.App.5th at page 1242, the court explained that its "concern about the Agency's provision of services lies not in the failure to identify programs and services tailored to Mother's needs, but in the delays that occurred throughout the dependency in actually getting Mother engaged in the identified services." Mother argues that here, as in *T.J.*, the parent education services provided by the Agency were appropriate but untimely, and on this basis, unreasonable.

We agree with mother that, in some respects, this case is factually similar to *T.J.* For example, as in *T.J.*, mother was initially referred to parent education services she did not qualify for and was wait-listed for others. (*T.J.*, *supra*, 21 Cal.App.5th at pp. 1243–1246.) Additionally, some of the Agency's referrals failed due to mother's refusal to work with particular providers, or because of her outbursts or belligerent behavior. (*Ibid.*) In both cases, the Agency was faced with clients with "difficulties caused by [their] recognized disability" who "were unquestionably difficult to work with." (*Id.* at p. 1247.) However, the facts which distinguish the two cases support the juvenile court's finding that the parent education services offered to mother were reasonable.

First, it is clear that mother began to receive parent education services via Zoom and during weekly face-to-face visits with the public health nurse before the Agency's involvement. Hands-on parenting instruction with the nurse continued until May 2023, when mother "fired" the nurse. The Agency also connected mother with clinicians with specialized training and experience providing hands-on parent education to disabled clients during the initial six-month reunification period.

Second, the manner in which the agency dealt with disruptions in services caused by mother's behavior is easily distinguished from *T.J.* When the mother in *T.J.* resisted services or requested a different provider, the agency took the position that "a social worker need not 'take the parent by the hand and escort . . . her to and through classes or counseling sessions' "; the agency made "no effort" to locate alternate services and "ceased to try to find help for her." (*T.J.*, *supra*, 21 Cal.App.5th at pp. 1246, 1247.) Here, in contrast, when services were disrupted or severed due to mother's behavior, the social worker and mother's disability advocate intervened to attempt to repair the relationships. Additionally, the Agency was proactive in locating different service providers when dispute resolution efforts failed. The juvenile court found that "when something did not work, the agency pivoted. They came up with a new plan, different people, different services to meet, accommodate and tailor services to this particular mother." Here, as in *In re Misako R.*, *supra*, 2 Cal.App.4th at page 547, "Far from evidencing inadequacy, the record shows the [Agency] commendably utilized a wide range of services" to assist mother in her reunification efforts.

### (3) Mother Was Provided or Offered Reasonable Services for Independent Living Skills

Mother asserts that the independent living skills training and assistance she received were unreasonably delayed because she was not assigned an IHHS provider until late January 2023. We disagree with mother's assertion that the independent living skills services were untimely.

From the outset of the case, the record reflects a continuous pattern of GGRC and the Agency linking mother with in-home independent living skills providers (IHHS, Arcadia, Emerald Care, Care Beyond) and community-based providers (Western Addition Family Resource Center) for independent living skills. Each referral eventually failed due to mother declining to

23

participate, "firing" the providers, or engaging in uncooperative behavior, which resulted in the provider declining to serve mother. Mother again notes the similarities to the *T.J.* case—where, as here, the mother's difficult behaviors resulted in service disruptions—but fails to discuss the differences, namely, that the Agency and GGRC in this case continued to advocate for mother and locate alternative services for her.

Mother next argues that the proffered independent living skills were unreasonable because "those services were only for a couple of hours per day—not the full-time support that mother needed." We reject this argument for three reasons.

First, the argument ignores the Agency's initial efforts to locate an alternative living environment in which mother could receive full-time support with childcare and tasks of daily living. Prior to disposition, the Agency attempted to locate a relative or support person mother could reside with who was capable of assisting her with childcare and tasks of daily living. This effort failed because mother's relative demanded that she move-out in April 2022 due to her threatening behavior and mother could not identify any other safe support person. The Agency next tried, and failed, to locate a live-in program for which mother qualified.

Second, mother, with the concurrence of her attorney and disability advocate, agreed to resolve mother's section 388 petition by stipulating to a modified case plan, which required the Agency to provide independent living skills services "accessible to people with disabilities." She did not assert in either her section 388 petition or the legal briefs she filed in connection with the combined 6-, 12-, and 18-month review that she required full-time, live-in assistance with tasks of daily living. Mother's failure to raise her alleged

24

need for full-time support in the juvenile court forfeits the issue. (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)

Third, although the social worker believed that mother's ability to care for the child would be enhanced by "24 hours per day, 7 days per week supervision," she determined that "unfortunately, that level of service delivery is not available." The Agency is not required to offer optimal services: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.*, *supra*, 2 Cal.App.4th at 547.) The juvenile court's determination that the independent living skills services provided to mother were reasonable under the circumstances is supported by substantial evidence.

**(4) The Agency Was Not Required to Offer Services to Address Mother's Mobility Needs**

Prior to the Agency's intervention, mother was "liv[ing] independently in a one-bedroom apartment," "able to meet her basic needs," and "able to take public transportation on her own." While it was apparent at the outset that mother had difficulty with stairs, no party ever identified mother's limited mobility as an issue which might potentially harm the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [agency must identify the potential harm to child arising from parent's disability].) When mother filed the section 388 petition to modify her case plan, she did not request additional services or accommodations to assist her with mobility issues. It was not until mother filed her "Closing Summation" in December 2023 that she first mentioned that the Agency had allegedly failed to tailor services to address her physical limitations.

A parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before the hearing." (*Earl L. v. Superior Court*, *supra*, 199 Cal.App.4th at p. 1505.)  In support of her argument that the Agency had a duty to provide additional services or accommodations to address her physical limitations, mother cites portions of the Agency's status review reports which discuss her struggle to get on the ground to play with the child and her inability to move fast to catch an active toddler.  These citations fall short of establishing that the Agency considered mother's physical limitations a barrier to reunification.  If mother thought otherwise, she had an able attorney and disability advocate to raise this issue on her behalf.  The fact that mother did not advocate for services to address her mobility needs until *after* the 18-month period for provision of reunification services had expired forfeits this issue.

## DISPOSITION

The petition is denied.  The temporary stay of the .26 hearing set for April 2024 is vacated.  Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2(A).)

_____
Mayfield, J.*

We concur:


_____
Stewart, P. J.


_____
Miller, J.



*L.B. v. San Francisco Superior Court; San Francisco Human Services Agency, RPI* (A169341)


        * Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.